N THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 17, 2020

**STATE OF TENNESSEE v. THOMAS BYRD**

**Appeal from the Criminal Court for Knox County**
**No. 105592   Bobby R. McGee, Judge**

_____

**No. E2020-00059-CCA-R3-CD**

_____

The Defendant, Thomas Byrd, was convicted by a Knox County Criminal Court jury of two counts of possession of .5 grams or more of a Schedule II controlled substance (cocaine) with the intent to sell/deliver within 1000 feet of a child care agency, a Class B felony; possession of a firearm during the commission of a dangerous felony, a Class D felony; possession of a Schedule VI controlled substance (marijuana), possession of a Schedule IV controlled substance (Alprazolam), and possession of a Schedule II controlled substance (oxycodone), all Class A misdemeanors; and criminal impersonation, a Class B misdemeanor.  The trial court sentenced him as a Range I offender to an effective term of twelve years in the Department of Correction.  On appeal, the Defendant argues that the trial court erred by denying his motion to suppress evidence found during the search of his person and that the evidence is insufficient to sustain the felony convictions.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee (on appeal), and Joshua Hendrick, Knoxville, Tennessee (at trial), for the appellant, Thomas Lenwood Byrd.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## FACTS

On June 26, 2013, the Defendant was a passenger in a vehicle driven by Tyshonna Byrd that was involved in a single vehicle accident in Knoxville. A police officer investigating the wreck detected the strong odor of raw marijuana about the Defendant's person, took him into custody, searched him, and arrested him. The search of the Defendant uncovered marijuana, crack cocaine, a hydrocodone pill, Alprazolam pills, $1,251.00 in cash, and two cell phones. Additional marijuana and key cards to a motel room were found inside the vehicle, and a search of the motel room uncovered, among other things, individual baggies of crack cocaine and marijuana, a loaded .45-caliber handgun, a set of digital scales, razor blades, and a box of empty plastic baggies. The Knox County Grand Jury subsequently returned a 20-count indictment against the Defendant and Tyshonna Sligh in which the two were charged together for various drug-related and possession of firearm offenses, and the Defendant was charged separately for criminal impersonation and possession of a firearm by a convicted felon. The trial court granted the Defendant's motion to sever the counts relating to events that occurred on an earlier date in June 2013, and the Defendant and his co-defendant were jointly tried for the set of offenses related to the June 26, 2013 events. At the conclusion of the trial, the jury convicted the Defendant of two counts of possession of .5 grams or more of cocaine within 1000 feet of a child care agency with the intent to sell, two counts of possession of .5 grams or more of cocaine within 1000 feet of a child care agency with the intent to deliver, possession of Alprazalom, possession of marijuana, possession of hydrocodone, criminal impersonation, and possession of a firearm during the commission of a dangerous felony. The trial court merged the possession with intent to deliver counts into the possession with the intent to sell counts and sentenced the Defendant to an effective term of twelve years in the Department of Correction.

## Motion to Suppress

On November 14, 2016, the Defendant filed a motion to suppress the evidence obtained from the June 26, 2013 search of his person, arguing that the search was unconstitutional because it was not a search incident to arrest and was made before the officer knew of the Defendant's outstanding arrest warrant and was performed when the officer had no reasonable basis to believe that the Defendant was engaged in criminal activity.

At the April 24, 2017 suppression hearing, Deric Runge, who was a patrol officer with the Knoxville Police Department ("KPD") in 2013, testified that he was headed northbound on Walker, which was also the entry ramp to the interstate, when he saw Lieutenant Chris Baldwin stopped behind a vehicle that appeared to have wrecked on the

shoulder. He stopped to assist and was walking toward the wrecked vehicle when he saw a man, later identified as the Defendant, walking toward the vehicle from the area of the K-Mart across the street. He and the Defendant met in the middle of the roadway, and he immediately detected the strong odor of raw marijuana emanating from the Defendant's person. When he greeted the Defendant and asked him to wait a minute, the Defendant put his hands in his pockets and began to back away. Based on his training and experience, he believed that the Defendant was about to flee, so he grabbed him and told him to "hold on a minute."

Mr. Runge testified that Lieutenant Baldwin came to assist him, and they placed the Defendant in handcuffs to gain control of the situation and to prevent the Defendant from leaving the scene. He asked the Defendant if he had any weapons or anything else in his pockets and if he minded if they searched him. The Defendant answered no, and he first briefly frisked the Defendant for weapons before patting him down more thoroughly. During the search, he felt a large wad in the Defendant's pocket and discovered marijuana, a large amount of cash, some pills, and a small amount of cocaine.

Mr. Runge testified that the Defendant told him his name was James Allen, but he was unable to find a record of anyone with that name. By that time, Lieutenant Baldwin had identified the woman from her driver's license as Tyshonna Sligh, which triggered Mr. Runge's memory of an event that had occurred two weeks earlier involving the Defendant and Ms. Sligh and for which there was an active warrant for the Defendant's arrest. He then asked the Defendant if he was Thomas Byrd, and the Defendant acknowledged that he was.

On cross-examination, Mr. Runge acknowledged that both the arrest warrant and the police report stated that the search of the Defendant was incident to his arrest. After listening to portions of his preliminary hearing testimony, he further acknowledged that he testified at that time that the search was incident to the Defendant's arrest. He explained that his memory of the events was affected by the passage of time. He stated that he took the Defendant into custody and frisked him for weapons because of the strong odor of raw marijuana that was emanating from his person. In his experience, drug dealers and other individuals who dealt with raw marijuana were frequently armed. Although his memory of the events was not clear, he agreed, based on the dashboard videos, that the sequence of events appeared to be that he handcuffed the Defendant, frisked him, moved him out of the roadway, and then patted him down before placing him in the back of his patrol vehicle. He also agreed, based on the dashboard footage, that he apparently did not know the Defendant's true identity until after he searched him. He testified that it was his practice to be sure a suspect did not have any weapons on him before placing him in the back of his patrol vehicle.

Investigator Philip Jinks of the Knoxville Police Department, called as a witness by the defense, identified the June 26, 2013 search warrant and supporting affidavit for the search of the motel room, in which he stated that the search of the Defendant's person had been incident to arrest. On cross-examination, he agreed that the smell of marijuana on a person would suggest that the person was in possession of marijuana, an illegal substance, and would be the basis for an arrest.

Mr. Runge, recalled as a witness for the defense, testified that the odor of raw marijuana about the Defendant's person caused him to believe that the Defendant had marijuana on him. His initial intention was to investigate further; at that point, he had not made the decision to cite or arrest the Defendant. However, the Defendant's actions in placing his hands in his pockets and stepping backwards caused the situation to accelerate:

> Well, normally, it would be questioning to figure out who he is and kind of going through that investigative process, but at which point of smelling it and placing his hands in his pockets and starting to back-pedal from the scene accelerate that process to place him in cuffs and then, at that point, go from there.

At the conclusion of the hearing, the trial court overruled the Defendant's motion to suppress. Finding that Mr. Runge had been very candid, the court accredited the former officer's testimony that he had detected the odor of raw marijuana on the Defendant's person and observed the Defendant engaging in nervous behavior that led the officer to believe he was about to flee the scene. The court, therefore, found that the officer had reasonable suspicion to conduct a further investigation and to perform a Terry frisk to ensure the officers' safety. The court further found that the officer "found matter in the pockets that gave him further reason to believe the defendant was in possession of raw marijuana."

## Trial

### State's Proof

Lieutenant Chris Baldwin of the Knoxville Police Department testified he was patrolling on Old Broadway on June 26, 2013, when he noticed a black Mazda stuck in a ditch. A man, later identified as the Defendant, was standing outside the vehicle talking to a woman, later identified as the co-defendant, Tyshonna Sligh, who was in the driver's seat. Lieutenant Baldwin activated his blue lights, which automatically triggered his patrol vehicle's camera, pulled up behind the vehicle, and got out to find out if anyone was hurt and if a wrecker was needed. As he approached, he immediately detected the sharp odor of burnt marijuana emanating from the vehicle. The Defendant, who had his cell phone to

- 4 -

his ear, walked across traffic to a grassy area. When Lieutenant Baldwin crossed to that area to talk to him, he immediately detected the strong odor of marijuana emanating from the Defendant.

Lieutenant Baldwin testified that he and Officer Runge, who pulled up to assist, took the Defendant into custody. Officer Runge then escorted the Defendant to his patrol vehicle, while Lieutenant Baldwin questioned Ms. Sligh. Ms. Sligh had a driver's license, but she was unable to identify the Defendant by anything other than his street name of "D," and was unable to provide the last name of the friend, "Todd," from whom she said she had gotten the vehicle. By that time, Officer Runge informed him that he had found a quantity of marijuana, crack cocaine, and some pills during his pat down search of the Defendant. Lieutenant Baldwin stated that he responded by calling the repeat offender unit to report that they had an individual in possession of a significant amount of drugs that they needed help identifying.

Lieutenant Baldwin testified that he handcuffed Ms. Sligh and placed her in the back of his patrol car, while Officer Runge placed the handcuffed Defendant in the back of Officer Runge's vehicle. He then had a wrecker tow their vehicle to the parking lot of the K-Mart across the street, where a K-9 officer performed a "drug sniff" around the vehicle.

On cross-examination, Lieutenant Baldwin testified that both the vehicle and the Defendant smelled of burnt marijuana, and he assumed that someone inside the vehicle had recently smoked marijuana. He later explained that he placed both the Defendant and Ms. Sligh in handcuffs because the circumstances surrounding what initially appeared to be a single vehicle accident were highly suspicious: the Defendant, Ms. Sligh, and the vehicle smelled of marijuana; the Defendant had no identification; Ms. Sligh did not know the Defendant's name; and Ms. Sligh had "no clue" to whom the vehicle belonged. He did not search Ms. Sligh before placing her in the back of his patrol vehicle because she did not appear to have any weapons on her, and there was no female officer on the scene to perform the search.

Deric Runge testified about his involvement in the investigation of the traffic accident and his discovery of a "pretty large baggie of marijuana" in one of the Defendant's pockets, as well as the large sum of cash, crack cocaine, and pills he found in either the same or other pockets. He identified the narcotics evidence he collected from the Defendant from the evidence log as consisting of 1 gram of crack cocaine, 4 grams of raw marijuana in a clear plastic bag, two 10 milligram oxycodone pills, one 1 milligram Alprazolam pill, and three additional 1 milligram Alprazolam pills. He also identified a photograph of the currency he found on the Defendant as consisting of two $100 bills, 51 $20 bills, two $10 bills, two $5 bills, and one $1 bill, for a total of $1,251. He testified that additional evidence he seized from the Defendant was a plastic baggie with what appeared

to be cocaine residue inside and two cell phones. He found no crack pipes or any other kind of drug paraphernalia on the Defendant.

On cross-examination, Mr. Runge testified that the Defendant smelled like raw marijuana rather than burnt marijuana. He could not recall what the vehicle smelled like.

Todd Lakins, a friend of the Defendant's, testified that he rented the vehicle and the motel room on behalf of the Defendant and the Defendant's girlfriend, Ms. Sligh, because they needed a vehicle and a place to stay and were unable to rent either themselves. He denied that he ever had a room key or a key to the vehicle or that he ever stayed in the motel room. He also denied that any of the items found in the vehicle or the motel room were his.

On cross-examination, he acknowledged that he owned a few guns but denied that the gun in the motel room was his. He said he had a handgun carry permit. He stated the Defendant provided him with cash to use to pay for the motel room and the rental car. The Defendant told him that he could not rent a motel room for himself but did not explain why, and he did not inquire. On redirect, he testified that he had to pass a background check to get his carry permit and that he had no felony convictions or misdemeanor drug convictions or arrests in his background. He denied that he was "dealing drugs" out of the motel room, that he set up the Defendant or Ms. Sligh, or that he ever sold the Defendant or Ms. Sligh any drugs.

Investigator Philip Jinks, who was accepted by the court as an expert in drug investigations, testified that he was assigned to the repeat offender unit in June 2013 and on June 26, 2013, was called out to assist Lieutenant Baldwin at the scene of the accident. By the time he arrived, the Defendant was in the back of one of the patrol vehicles and Ms. Sligh was in the back of another. As he approached their vehicle, he immediately detected the odor of raw marijuana. After he had the vehicle towed to the K-Mart parking lot across the street, a K-9 officer walked his dog around the vehicle to confirm the odor of controlled substances. Inside the vehicle, he found three hotel room keys for Room 442 of the Express Inn on Dante Road, an Enterprise rental car agreement in the name of Todd Lakins in the glovebox, a cell phone in the driver's door pocket, and a small marijuana grinder with some marijuana residue in the trunk. He testified that, in his experience, it was common for drug traffickers and drug distributors to drive rental vehicles rented in someone else's name and to use hotel rooms rented by someone else as a base for their drug activity in order to distance themselves from the illegal activity.

Investigator Jinks testified that he went to the Express Inn and walked past room 442. He detected a moderate odor of marijuana coming out of the room's air conditioning vent, called for the K-9 officer to walk his drug-detecting dog past the room to confirm the

odor, and left officers on site to ensure that no one entered or exited the room while he obtained a search warrant.

Investigator Jinks identified photographs of items he found in the motel room during the execution of the search warrant, which included: various items of men's and women's clothing, including a size small ladies' blouse; a cell phone store receipt dated the previous day in the name of the Defendant; a business card for Sergeant Phillip Major of the Knoxville Police Department; loose tobacco in the trash can; a "Swisher Sweets" cigar packet that had been cut open; two razor blades with a white waxy residue consistent with cocaine on the bathroom counter; a box of plastic sandwich bags inside the nightstand; a set of digital scales inside the nightstand; a small bud of marijuana on the floor; and a Wahl brand clipper set bag in the bathroom that contained a loaded .45-caliber Sig Sauer handgun in a holster with an extra magazine, and a can of shaving cream with an false bottom. Inside the shaving cream "can safe" he found a bag of marijuana that field tested as 12.6 grams and a bag containing numerous small rocks of crack cocaine that field tested as 5.7 grams.

Investigator Jinks testified that he interviewed Mr. Lakins at his home. He did not see any drug paraphernalia and did not smell any marijuana, and Mr. Lakins did not appear to be under the influence of any intoxicant. Mr. Lakins provided a straightforward account of his involvement with the rental vehicle and the motel room that was consistent with his trial testimony, and Investigator Jinks ultimately eliminated him as a suspect in the case.

Investigator Jinks testified that he did not find any crack pipes, filters, or other drug paraphernalia in the rental car or in the motel room. He explained the manner in which a drug dealer would typically use the items found in the motel room, including the plastic bags, razor blades, digital scales, and loaded weapon, and he estimated that the amount of crack cocaine in the can safe had a street value of approximately $500. He stated that the individual rocks of cocaine and the large amount of cash that Officer Runge found on the Defendant's person at the crash site were also consistent with a drug dealer rather than a user. Finally, he opined that the crack cocaine possessed in the case was intended for resale rather than personal use. He explained that his opinion was based on the totality of the circumstances, which included: the amount of cocaine, which was far more than a typical user would have; the lack of any drug paraphernalia or items necessary to smoke the crack cocaine; the items used to divide, package, and weigh the cocaine for resale; the large amount of cash, which was not common for the average crack user, who tended to "blow through money very quickly"; and the loaded weapon, which was typical for a drug dealer or distributor to possess in order to protect his product.

On cross-examination, Investigator Jinks acknowledged that the grinder found in the trunk of the rental vehicle was an item typically possessed by a marijuana user. He further acknowledged that it was possible for a drug user to add crack cocaine to marijuana

to smoke and that a razor blade could be used to cut the rocks of crack cocaine into small enough pieces to be added to a "blunt" or cigar. He also agreed that "Swisher Sweets" is a cigar that is commonly used to roll a blunt. He testified that the typical crack cocaine user purchases two to three rocks of crack cocaine at a time but acknowledged that it was possible that a user in possession of more cash might buy a larger quantity. He repeated, however, that in his experience most users or addicts blew through their money quickly.

Beth Goodman, who was employed with the Knoxville Police Department as an evidence technician in 2013, testified that she lifted a total of two latent prints from items in the motel room, a Powerade bottle and a phone accessory box. She attempted to lift fingerprints from the gun and the magazine but was unsuccessful.

Timothy Schade, a certified fingerprint examiner formerly employed by the Knoxville Police Department who was accepted by the court as an expert in latent fingerprint examination, testified that he verified that the latent print lifted from the Powerade bottle belonged to the Defendant.

Sergeant Phillip Major of the Knoxville Police Department's organized crime unit identified the business card found in the motel room as one that he had given Ms. Sligh during an encounter on June 13, 2013. He said he had hand-corrected an erroneous phone number that was printed on the card.

Department of Human Resources employee Ashley Taylor, who worked in the childcare licensing division, testified that First Step II daycare, located at 4605 Old Broadway, Knoxville, Tennessee, and Kids First Incorporate Daycare, located at 6700 Central Avenue Pike, Knoxville, Tennessee, were both licensed and operational on June 26, 2013.

Tennessee Bureau of Investigation ("TBI") chemist Carl Smith, the expert in forensic chemistry who analyzed the drug evidence recovered from the Defendant's person, testified that it consisted of .83 grams of cocaine, 3.19 grams of marijuana, a total of four tablets of Alprazolam, and two tablets of oxycodone.

TBI special agent forensic scientist Michael Bleakley, the expert in forensic chemistry who analyzed the evidence recovered from the motel room, testified that it consisted of 11.33 grams of marijuana and 5.43 grams of cocaine base.

Donna Roach of the Knoxville Geographic Information System identified a map showing the 1000-foot buffer areas surrounding the two daycare centers. She testified on cross-examination that the distance from the accident site to the daycares was 306 feet and 509 feet, respectively.

**Defendants' Proof**

Tyshonna Sligh testified that she and the Defendant had a volatile dating relationship in 2013 and that she went back and forth between her apartment and the Defendant's house depending on the status of their relationship. On June 26, 2013, she and the Defendant had recently fought, and she was staying at her grandmother's home but called the Defendant to come get her. The Defendant picked her up in a vehicle that she did not recognize. Later, she was driving the vehicle when she and the Defendant began to argue about whether each was being unfaithful to the other. During the argument, she hit the Defendant with her arm, which caused her to swerve toward an oncoming car and then overcorrect, landing them in the ditch. She told the police officers who stopped to investigate that she did not know who the Defendant was because she did not want to get the Defendant into trouble.

Ms. Sligh testified that she had smoked marijuana in the past with the Defendant but had not been smoking that day. She said she was an addict and a heavy marijuana and cocaine user. She knew nothing about the motel room keys and had never been to any hotel or motel with the Defendant. She was familiar with Mr. Lakins because she had seen him at the Defendant's house and was aware that he provided drugs to the Defendant and sometimes used them with her and the Defendant. She said Mr. Lakins sometimes brought friends with him to the Defendant's home, including a lady friend who was smaller than Ms. Sligh. According to Ms. Sligh, she had never seen the woman's shirt that was found in the motel room and had never worn a size small. She did not recognize the men's clothing or any of the other items found in the motel room.

On cross-examination, she acknowledged that she lied to the police when she said she did not know the Defendant's name. She further acknowledged that she lied to her aunt when she spoke to her on her cell phone while in the back of the patrol car and told her that the Defendant had wrecked the car and tried to run from the police. Finally, she admitted she had been convicted of misdemeanor theft in Knox County in 2007.

Vickie Brewer, a Knox County probation officer, testified that the Defendant tested positive for marijuana and cocaine during the period she supervised him. On cross-examination, she testified that the Defendant was placed on probation with her office on November 4, 2014. His first positive drug test, for marijuana, occurred on May 6, 2015, during his first drug screen. His positive drug test for cocaine occurred on December 22, 2015, which was the first time he tested positive for cocaine.

Stoney Gentry testified that he worked for the Knox County Sheriff's Office Pretrial Division and supervised the Defendant while he was out on bond in late 2012 into 2013.

He said the Defendant tested positive for marijuana during a court drug screen that occurred on October 23, 2012. The Defendant also admitted that he used marijuana on January 31, 2013. On cross-examination, he testified that the Defendant did not admit to using cocaine. Upon further questioning, he not only agreed that a drug seller could be a user but added that he had never dealt with anyone who sold drugs who did not also "partake in the use at some point."

The Defendant testified that he began using drugs at the age of twelve, beginning with marijuana but moving on to other drugs, including cocaine, as he got older. By the age of sixteen or seventeen, he was partying with friends and regularly using drugs. He described how he smoked crack cocaine by breaking it up in smaller pieces with a razor blade and rolling it up in a blunt with marijuana. He testified that he was a rapper and a flashy person with a "grille" or gold teeth, and that his flashy appearance and "show off" personality, including his propensity to carry a lot of cash, led to his being regularly stopped and harassed by the police.

The Defendant testified that he and Mr. Lakins together smoked marijuana and "ping tin," which was marijuana laced with crack cocaine. He never sold Mr. Lakins any drugs or bought any drugs from him. On June 26, 2013, a "shade tree" mechanic friend came to the Defendant's house to work on the brakes of the Defendant's vehicle. The mechanic brought with him another man who was interested in purchasing some rims that the Defendant owned. The Defendant sold the man the rims and some tires, and he then asked the mechanic to give him a ride somewhere so that he could "get high." The Defendant testified that he called Mr. Lakins, learned he was at the motel, and had the mechanic drop him off at Mr. Lakins' motel room.

The Defendant testified that Mr. Lakins had a "junkie prostitute" in the room with him. He said Mr. Lakins sold him a "party pack" of four or five grams of strong marijuana, some pills, and some crack cocaine. Before leaving the motel room, the Defendant sat on the side of the bed, rolled a blunt, and lit it. At about that time, Ms. Sligh began calling him on his phone. Because he thought Ms. Sligh was cheating on him and he wanted to check up on her by using a vehicle that she did not recognize, he borrowed Mr. Lakins' rental car.

The Defendant testified that he smoked the marijuana blunt while he was driving the vehicle and tossed it out the window when he was through. He tracked Ms. Sligh down at her grandmother's home and let her drive the vehicle when she voiced her suspicion that it belonged to a woman and was not borrowed from Mr. Lakins. The Defendant said that the accident occurred after he received a text from his child's mother, and Ms. Sligh began wrestling him for his cell phone so that she could read the text.

The Defendant denied that he tried to run from the police. He said he took some steps backward when the officer approached him and told him he smelled like "weed" because the officer tried to grab him. He said it was a normal human reaction and that he felt targeted by the police because of his appearance. He testified that the drugs in his pocket were part of his "party pack" that he had intended to use for himself. None of the items in the motel room were his, and he assumed they all belonged to Mr. Lakins.

On cross-examination, the Defendant acknowledged he had lied under oath at an earlier court hearing when he said he was not familiar with cocaine. He said he lied to the arresting officer about his name because he felt violated by the search and seizure. In his opinion, the officer had no right to detain him because smelling like marijuana is not a crime. The Defendant testified that the drugs he had in his pocket were not separated into individual bags when he had them, and he speculated that the TBI had packaged them in that manner.

## ANALYSIS

### I. Denial of Motion to Suppress

The Defendant first contends that the trial court erred in denying his motion to suppress the results of the search of his person. The Defendant argues that the odor of marijuana on his person did not create either reasonable suspicion or probable cause sufficient to justify the detention and frisk and that there were no exigent circumstances to justify the warrantless search.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. The application of the law to the facts found by the trial court is a question of law and is reviewed de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the United States and Tennessee constitutions prohibit unreasonable searches and seizures. U.S. Const. amend IV; Tenn. Const. art. I, §7. Generally, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State

demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 630. The State has the burden to demonstrate, by a preponderance of the evidence, that a warrantless search falls under one of the exceptions to the warrant requirement. State v. Harris, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

The trial court concluded, based on the totality of the circumstances, that no Fourth Amendment violation occurred because the officer had a reasonable basis to suspect that the Defendant was engaged in criminal activity and to conduct the pat down search that led to the discovery of the drugs. The court accredited the officer's testimony that he smelled raw marijuana on the Defendant and observed the Defendant engaging in nervous behavior that led the officer to believe he was about to flee. The court found that the officer was, therefore, justified in performing a Terry frisk for the officers' safety and that the officer found matter in the Defendant's pockets during the pat down search that "gave him further reason to believe the [D]efendant was in possession of raw marijuana."

We conclude that the trial court properly denied the motion to suppress. A warrant is not required for an investigatory stop "when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997); see also Terry v. Ohio, 392 U.S. 1, 21 (1968). Reasonable suspicion exists when "specific and articulable facts . . . taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. "Whether reasonable suspicion for an investigatory stop exists must be evaluated under the totality of the circumstances known to the police at the time of the stop." State v. Nicholson, 188 S.W.3d 649, 659 (Tenn. 2006).

Probable cause for an arrest exists when "at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." State v. Echols, 382 S.W.3d 266, 277-78 (Tenn. 2012). "When determining whether probable cause existed for a warrantless arrest, courts should consider the collective knowledge that law enforcement possessed at the time of the arrest, provided that a sufficient nexus of communication existed between the arresting officer and any other officer or officers who possessed relevant information." State v. Bell, 429 S.W.3d 524, 530 (Tenn. 2014).

Mr. Runge testified that he had not yet decided to arrest the Defendant when he first met him in the middle of the road and detected the odor of raw marijuana on his person but the Defendant "accelerated" the process by placing his hands in his pockets and backing away. Although his memory of the events was hazy, he recalled that he believed the Defendant was in possession of raw marijuana, which was an indicator of a drug dealer,

that the Defendant was on the verge of fleeing, and that the Defendant posed a risk to the officers' safety. He indicated that he and his lieutenant handcuffed the Defendant and that he briefly frisked him for weapons before moving him out of the middle of the roadway and continued with a more thorough pat down protective search to ensure the Defendant had no weapons before placing him in the back of his patrol vehicle. During that search, he felt the large wad of marijuana, cash, and other drugs in the Defendant's pocket.

Mr. Runge never specifically testified as to when the made the decision to arrest the Defendant or even if it was his decision, rather than his lieutenant's. His testimony at the hearing, however, was unequivocal that he smelled the strong odor of raw marijuana on the Defendant, which made him believe that the Defendant was in possession of raw marijuana and could be a drug dealer. Notably, he also acknowledged that he had testified at the preliminary hearing, when his memory was presumably fresher, that the search was incident to the Defendant's arrest.

Based on the evidence presented at the suppression hearing and at trial, the officers clearly had not only reasonable suspicion sufficient to detain and frisk the Defendant, but also probable cause to arrest the Defendant and search him incident to his arrest under the totality of the circumstances, which included not only the Defendant's raw marijuana odor, lack of identification, and furtive behavior but also Ms. Sligh's purported ignorance about the Defendant's identity and the ownership of the wrecked vehicle. Therefore, regardless of whether the search that uncovered the contraband was a Terry frisk for officer safety or a more thorough search incident to arrest, we conclude that the trial court properly overruled the Defendant's motion to suppress.

## II. Sufficiency of the Evidence

The Defendant also contends that the evidence is insufficient to sustain his felony convictions. Specifically, he argues that there was insufficient proof that he possessed the drugs found on his person for resale rather than personal use and insufficient proof that the drugs and gun found in the motel room belonged to him. In support, he cites, among other things, his positive drug tests and the fact that the motel room and the vehicle were rented by Mr. Lakins. He also relies heavily on his own and his co-defendant's testimony denying that they used the motel room or had any involvement in the drugs and gun found inside it. The State responds that the evidence, when viewed in the light most favorable to the State, was sufficient to show that the Defendant committed the crimes. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn.

R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"Possession" may be actual or constructive, and may be proved by circumstantial evidence. See State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001); State v. Bigsby, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). Additionally, the jury may infer from the amount of controlled substance, along with other relevant facts surrounding the arrest, that a defendant's possession of a controlled substance was with the intent of selling it. Tenn. Code Ann. § 39-17-119.

When viewed in the light most favorable to the State, the evidence was sufficient for a rational jury to reasonably conclude that the Defendant possessed the cocaine and firearm found in the motel room and that his possession of the cocaine on his person and in the motel room was with the intent to sell it. Investigator Jinks testified at length as to why the circumstances led him to believe that the Defendant possessed the cocaine for resale rather than personal use. Among those circumstances were the large amount of cocaine, the materials used to cut, weigh, and package the cocaine into individual baggies for resale, the large amount of cash the Defendant had in his possession, the loaded gun, and the lack of any crack pipes or other paraphernalia required to smoke crack cocaine. The jury heard the testimony of the Defendant and his codefendant, who both denied that the Defendant was involved in the sale of cocaine or that any of the items in the motel room were his. By its verdicts, the jury obviously chose not to accredit their testimony. This was its prerogative as the trier of fact. We, conclude, therefore, that the evidence was sufficient to sustain the Defendant's convictions.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____

ALAN E. GLENN, JUDGE